IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

NEW YORK LIFE INSURANCE
COMPANY,

    Plaintiff,

vs.                                                    Civ. No. 17-621 KG/KK

ROGER SAUL, ROSEANNE SILVA, and
ESTATE OF JAMES SILVA, deceased,

    Defendants.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon Plaintiff's Opposed Motion for Summary Judgment (Motion for Summary Judgment), filed November 20, 2017. (Doc. 57). Defendant Roger Saul filed a response on December 6, 2017,[1] and Plaintiff filed a reply on December 21, 2017. (Docs. 64 and 66). Having considered the Motion for Summary Judgment and the accompanying briefing, the Court grants the Motion for Summary Judgment.

A. *Factual Background*[2]

James Silva was hospitalized from July 20, 2013, through July 29, 2013, for medical conditions associated with alcoholism. (Doc. 57-3) at ¶ 8. Mr. Silva was again hospitalized from February 4, 2015, to February 5, 2015, for chest and leg pain. (Doc. 57-2) at 2.

On June 28, 2015, Mr. Silva applied for a $100,000 life insurance policy with Plaintiff. (Doc. 57-1). In his application, Mr. Silva designated Defendant Rosanne Silva, his spouse, as the sole beneficiary. *Id.* Mr. Silva also answered "No" to the following question in the application: "In the past 2 years, for any condition, have you been admitted to or confined in a

---

[1] Defendant Roseanne Silva did not respond to the Motion for Summary Judgment.

[2] Unless otherwise noted, this Factual Background consists of undisputed material facts.

hospital, nursing home, extended care or special treatment facility?" *Id.* Mr. Silva, in signing the application, acknowledged the following: "I represent that, to the best of my knowledge and belief, the information on this request is true and complete." *Id.* He further acknowledged that "[i]f material facts have been misstated here, benefits may be denied if the insured's death occurs within the first two years after the Insurance Date." *Id.*

Plaintiff accepted Mr. Silva's insurance application and issued Mr. Silva a $100,000 life insurance policy, certificate number A8118559, with an Insurance Date of July 14, 2015. (Doc. 57-4) at 2. Relevant to this lawsuit, the policy has an incontestability clause which states, in pertinent part:

> Except for nonpayment of PREMIUMS, WE cannot contest the validity of the insurance … after it has been in force for two years during the INSURED's lifetime from … the INSURANCE DATE…. To contest, WE will only rely upon statements signed by the OWNER in applying for such insurance.

*Id.* at 4.

Mr. Silva then passed away on June 16, 2016, within the 2-year contestability period. (Doc. 57-2) at 1. Mrs. Silva subsequently submitted a claim to Plaintiff to collect on Mr. Silva's life insurance policy. (Doc. 57-2) at 1. According to Mr. Saul, in November 2016, he "agreed to champion the widow Silva's cause by accepting an assignment of $10,000 … of the policy; with an understanding that [he] would apply 100% of all net proceeds from any award toward her rental arrears for her Elder Care/Hospice."[3] (Doc. 57-8) at 2. On January 4, 2017, Mrs. Silva assigned to Mr. Saul $10,000 of the proceeds of the life insurance policy in consideration for Mr.

---

[3] Mr. Saul also indicated in his answer to the Complaint for Declaratory Relief (Complaint) (Doc. 1) that Mrs. Silva told him that he "should proceed with her support and concurrence." (Doc. 6) at 10.

Saul's application of "all net cash proceeds" toward her "rental arrears" for "Elder Care/Hospice."[4] (Doc. 57-6).

In identical letters dated April 28, 2017, Bates Number 000021, (Doc. 57-2), and May 11, 2017, Bates Number 000014, (Doc. 64) at 7, Plaintiff informed Mrs. Silva of its decision to deny her claim for the life insurance proceeds. Plaintiff explained that Mr. Silva "did not disclose material information concerning his medical history" when he indicated on the insurance policy application that he had not been hospitalized in the past 2 years although, in fact, he had been hospitalized on July 20, 2013, and on February 4, 2015. (Doc. 57-2) at 2. Plaintiff stated that had it "been aware of this medical information when processing the insured's application [it] would have declined to issue this coverage." *Id.* Plaintiff then concluded that "the appropriate resolution is to rescind the Contract." *Id.* To that end, Plaintiff noted that it would send Mrs. Silva a check to "refund … all the premiums paid, plus interest." *Id.* Plaintiff further explained that

> Your endorsing, cashing or depositing of this check will constitute your agreement to rescission of the Contract. By doing so, you agree that the Contract is of no force or effect and irrevocably waive and release all claims you may have under the Contract. The refund check is being sent to you on the express condition that your acceptance of this check is without reservation and in full and complete satisfaction of any claims you may have under the Contract.

*Id.* Moreover, Plaintiff stated that "you may contest our decision by bringing a legal action in court." *Id.*

Plaintiff separately sent Mrs. Silva a check dated April 28, 2017, for $1,928.69. (Doc. 57-5). The check notes on it: "Refund of premiums paid under contract A8118559. Coverage is

---

[4] Mr. Saul later claimed that he has a 50% interest in the life insurance proceeds. (Doc. 6) at 6, ¶ 5; (Doc. 57-7) at 2. Mr. Saul also attached to his response a blank "Collateral Assignment" form created by Plaintiff. (Doc. 64) at 6.

3

hereby rescinded."[5] *Id.* Mrs. Silva endorsed the back of the check and cashed it. *Id.* Sometime later, Mr. Saul wrote a check to Plaintiff for $1,928.69.[6] (Doc. 64) at 13. There is no evidence that Plaintiff received Mr. Saul's check let alone cashed it.

Roderick Boggs, a corporate vice president for Plaintiff, attested in a declaration that Plaintiff will not issue a life insurance policy to an applicant that "is receiving or has recently received medical treatment for serious medical conditions related to alcoholism…." (Doc. 57-3) at ¶ 6. Mr. Boggs further attested that if Plaintiff had known about Mr. Silva's hospitalization for alcoholism related conditions, Plaintiff would not have issued a life insurance policy to Mr. Silva. *Id.* at ¶ 9. Mr. Boggs noted that "Mr. Silva's medical conditions disqualified him from coverage completely and could not have been dealt with through an increased premium." *Id.* at ¶ 10. In addition, Mr. Boggs attested that Plaintiff "relied on Mr. Silva's representation that he had not been hospitalized in the two years prior to his application." *Id.* at ¶ 12. Consequently, Plaintiff "did not have any reason to investigate Mr. Silva's medical history" prior to issuing the life insurance policy.[7] *Id.* at ¶ 11.

---

[5] Mr. Saul states that this language "is effectively illegible" because of its "micro-font." (Doc. 64) at 3, ¶ 17. Even so, Mr. Saul admits that he can read the print with a magnifying glass. *Id.* The Court notes that it can read the print without a magnifying glass.

[6] The copy of the check Mr. Saul submitted with his response is not very legible. For instance, the Court cannot make out the date of the check. (Doc. 64) at 13.

[7] Mr. Saul seems to suggest that the Court should disregard Mr. Boggs' declaration as "overly vague, lacking in alternative resolution, and biased toward the financial interests of" Plaintiff. (Doc. 64) at 2, ¶ 9. Mr. Saul, however, fails to support these conclusory allegations with any substantive argument or evidence. Hence, the Court will consider Mr. Boggs' declaration in deciding this Motion for Summary Judgment.

4

B. *Relevant Procedural History*

   *1. The Complaint*

   Plaintiff is suing Mr. Saul, Mrs. Silva, and the estate of Mr. Silva to seek a

   declaratory order that the Policy was effectively rescinded, that the beneficiary has
   affirmatively waived all claims under the Policy, that no proceeds are payable under the
   Policy, and that no action may be brought under the Policy.

(Doc. 1) at ¶ 2. Plaintiff alleges that the life insurance policy was rescinded because Mr. Silva "died during the Policy's contestability period" and Plaintiff's "investigation revealed that Mr. Silva had made a material misrepresentation on his insurance application…." *Id.* at ¶ 3. Plaintiff further alleges that Mrs. Silva waived any claims under the life insurance policy when Plaintiff advised Mrs. Silva

   in writing that the Policy was being rescinded, that [Mrs.] Silva was advised in writing
   that she would receive a check refunding the premiums paid, that [Mrs.] Silva was
   advised in writing that cashing, depositing, or endorsing the check would constitute
   acknowledgment of the rescission and waiver of all claims under the Policy, and that she
   cashed or deposited the check.

*Id.* at ¶ 4. Finally, Plaintiff alleges that Mr. Saul has no claim against Plaintiff because his

   interest, if any, is only in the proceeds of the Policy and that rescission of the Policy
   extinguished any claim that Mr. Saul otherwise may have had as the existence of a valid
   Policy is a condition precedent of Mr. Saul's claims.

*Id.* at ¶ 5.

   *2. Mr. Saul's Counterclaims (Doc. 6) and Bifurcation*

   Mr. Saul answered Plaintiff's Complaint and raised counterclaims based on Plaintiff's failure to pay the $100,000 claim and bad faith insurance practices. (Doc. 6) at 8-9. In November 2017, the Court bifurcated this case so that the Court could first address the issues raised in Plaintiff's Complaint and then, if necessary, address the counterclaims. (Doc. 58). The

Court agreed with Plaintiff that if a judgment is entered in favor of Plaintiff on its Complaint then Mr. Saul's counterclaims would be moot. *See id.* at 5.

### 3. *The Motion for Summary Judgment*

Plaintiff makes three arguments in support of its Motion for Summary Judgment. First, Plaintiff argues that the life insurance policy was rescinded by virtue of Mr. Silva's misrepresentation in the insurance application. Second, Plaintiff argues that the doctrine of accord and satisfaction, or mutual rescission, precludes Mrs. Silva's claim to the life insurance policy proceeds. Third, even if the Court decides that summary judgment is not appropriate on the basis of rescission, Plaintiff asserts that the doctrine of champerty precludes Mr. Saul from benefitting from the life insurance proceeds.

Mr. Saul opposes the Motion for Summary Judgment in its entirety. Mr. Saul also "request[s] the right to amend, supplement, or otherwise clarify" his response to the Motion for Summary Judgment "should Plaintiff's Motion not be ***summarily denied***." (Doc. 64) at 4.

### C. *Summary Judgment Standard*

Summary judgment is appropriate if the moving party shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767 (10th Cir. 2013). A dispute over a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). The Court views the facts in the light most favorable to the nonmoving party and draws all reasonable inferences in the nonmoving party's

favor. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013).

D. Discussion

    *1. Rescission*

In New Mexico, rescission of an insurance policy is generally "allowed where there has been a misrepresentation of a material fact, the misrepresentation was made to be relied on, and has in fact been relied on." *Prudential Ins. Co. of Am. v. Anaya*, 1967-NMSC-132, ¶ 8, 78 N.M. 101; *see also* NMSA 1978, § 59A-18-11(C) (2015 Repl. Pamp.) ("The falsity of any statement in the application for any policy covered by this Code may not bar the right to recovery thereunder unless such false statement materially affected either the acceptance of the risk or hazard assumed by the insurance company."). The insurer bears the burden of proving that a fraudulent misrepresentation is "sufficient to avoid its liability on the contract." *Crow v. Capitol Bankers Life Ins. Co.*, 1995-NMSC-018, ¶ 38, 119 N.M. 452.

"[G]enerally speaking, the good faith with which the misrepresentation is made is immaterial." *Anaya*, 1967-NMSC-132, ¶ 8. Moreover, in the context of an alleged misrepresentation of medical history in an insurance policy application, the "misstatement is material if it takes away the insurer's opportunity to estimate its risk under its contract." *Id.* at ¶ 16. In other words, the test for determining the materiality of a misstatement or misrepresentation in that situation "is whether plaintiff, as a reasonably prudent insurer, would have rejected the risk if it had known the true facts concerning the medical history…." *Id.* at ¶ 17; *see also Crow*, 1995-NMSC-018, at ¶ 36 (finding in life insurance case that "[a] question in an insurance application propounded for the purpose of determining the existence of a significant bodily disorder allows the insurer to evaluate whether the disorder makes the insured an unacceptable risk"); *Jackson Nat. Life Ins. Co. v. Receconi*, 1992-NMSC-019, ¶ 24, 113 N.M.

7

403 (finding in life insurance cases that "applicant's health status is critical to a life insurer's ability to gauge and evaluate the risk it is being asked to insure. An insurer has the right to intelligently pass upon the risk insured.").

With respect to the reliance elements of a rescission claim, "misrepresentation is indicated when the insurer relies upon statements that were certainly known by the insured to be untrue, or when these statements 'are of such character to prove a conscious misrepresentation.'" *Crow*, 1995-NMSC-018 at ¶ 38 (citation omitted). Courts agree that an "insurer is entitled to rely on an insured's representations" and that the insured has "the burden 'to supply complete and accurate information to the insurer.'" *White v. Cont'l Gen. Ins. Co.*, 831 F.Supp. 1545, 1553 (D. Wyo. 1993) (citations omitted). Accordingly, the insurer does "not have a duty to investigate and thus [is] entitled to rely on" the insured's representations in an application for insurance. *Id.*

### a. Whether Mr. Silva's Misrepresentation was Material

The undisputed evidence shows that on June 28, 2015, Mr. Silva made a misrepresentation in his insurance application when he checked "No" in response to the question asking whether he had been admitted to a hospital in the past 2 years. In fact, Mr. Silva had been hospitalized from July 20, 2013, through July 29, 2013, and again from February 4, 2015, to February 5, 2015, hospitalizations occurring well within the 2 years prior to the June 28, 2015, life insurance application date. (Doc. 57-3) at ¶ 8; (Doc. 57-2) at 2. Obviously, Mr. Silva's health status was critical to Plaintiff's ability to evaluate the risk of issuing life insurance to Mr. Silva. As Mr. Boggs indicated, had Plaintiff known about the July 20, 2013, hospitalization related to alcoholism, Plaintiff would have denied Mr. Silva's application and not issued the life insurance policy. (Doc. 57-3) at ¶ 9. Moreover, Mr. Saul has failed to provide evidence from which a reasonable jury could find that a reasonably prudent insurer would accept the risk

8

presented in Mr. Silva's medical history. Under these undisputed facts, Mr. Silva's misrepresentation on the life insurance application was material as a matter of law.

Mr. Saul, nonetheless, makes several arguments that the misrepresentation was not material. First, he argues that, under the incontestability clause of the insurance policy, Mr. Silva was obligated to disclose hospitalizations which occurred in a 2-year period beginning on July 14, 2015, the Insurance Date for the policy. Even using this 2-year time period, the July 20, 2013, hospitalization occurred within that time period. Interestingly, Mr. Saul seems to agree with this assessment as well. (Doc. 64) at 1 ("July 2013 hospitalization occurred 99.18% of 'two years' ago…."). This argument, therefore, fails.

Second, Mr. Saul argues that the "representations were founded in good faith." *Id.* at ¶ 8. However, as observed above, good faith is immaterial to the making of a misrepresentation. Consequently, this argument has no merit.

Third, Mr. Saul argues that Plaintiff "could/should have required a medical examination or researched Mr. Silva's medical records" prior to deciding to issue the life insurance policy. *Id.* at 2. The caselaw described above does not require Plaintiff to investigate Mr. Silva's representations. Hence, this third argument fails as well.

Finally, Mr. Saul argues that New York "could/should have made a reasonable actuarial recalculation of risk assessment, via either (1) a reasonable premium increase, or (2) a reasonable benefit reduction." *Id.* at 2, ¶ 9. Mr. Saul fails to provide any legal support for this argument. Mr. Boggs, on the other hand, specifically attested that Mr. Silva's medical condition was such that Plaintiff would not provide coverage at all to Plaintiff and that the medical condition "could not have been dealt with through an increased premium." (Doc. 57-3) at ¶ 10. Mr. Saul's last argument also has no merit.

9

In sum, Mr. Saul's arguments regarding the materiality of Mr. Silva's misrepresentation in the life insurance application do not have merit as a matter of law.

> b. *Whether Mr. Silva Intended Plaintiff to Rely on the Misrepresentation and Whether Plaintiff did Rely on the Misrepresentation*

Plaintiff persuasively argues that

> [b]y filling out the Application, executing it, and sending it to New York Life in furtherance of his attempt to obtain a life insurance policy, Mr. Silva necessarily intended New York Life to rely on his application and the statements contained in the application.

(Doc. 57) at 8. In other words, Plaintiff seems to argue that Mr. Silva intended Plaintiff to rely on the misrepresentation in the application because Mr. Silva knew the misrepresentation was untrue or, at the very least, because the misrepresentation was "of such character to prove a conscious misrepresentation." *Crow*, 1995-NMSC-018 at ¶ 38. In addition, the insurance application itself put Mr. Silva on notice that Plaintiff would be relying on Mr. Silva's information. (Doc. 57-1) (stating that misstatement of facts could lead to denial of benefits "if the insured's death occurs within the first two years after the Insurance Date."). Furthermore, Mr. Saul does not present any evidence to suggest that Mr. Silva did not intend for Plaintiff to rely on the untruthful information in the insurance application. No reasonable jury considering the above circumstances in the light most favorable to Defendants could find that Mr. Silva did not intend for Plaintiff to rely on his misrepresentation about prior hospitalizations. Furthermore, it is undisputed that, according to Mr. Boggs, Plaintiff "relied on Mr. Silva's representation that he had not been hospitalized in the two years prior to his application." (Doc. 57-3) at ¶ 12.

> c. *Conclusion*

The Court determines that Mr. Saul has not set forth specific facts showing that there is a genuine issue of material fact with respect to the rescission issue nor does he convince the Court

10

that it should deny Plaintiff's request for summary judgment on this issue as a matter of law. Thus, the Court finds that the undisputed evidence demonstrates that Mr. Silva misrepresented a material fact in his life insurance application; Mr. Silva intended for Plaintiff to rely on the misrepresentation; and that Plaintiff did rely on the misrepresentation. The life insurance policy, therefore, as a matter of law, was rescinded and the life insurance policy is void for that reason. *See Crow*, 1995 NMSC-018 at ¶ 36 (noting that material misrepresentation in answering health-related question on life insurance application "will render the policy void."). Consequently, summary judgment will be entered in favor of Plaintiff on the basis of rescission of the life insurance policy.

### 2. *Accord and Satisfaction (Mutual Rescission)*

Plaintiff further argues that it is entitled to summary judgment on the basis of accord and satisfaction, also referred to as mutual rescission. *See Warren v. New York Life Insurance Co.*, 1936-NMSC-031, ¶ 27, 40 N.M. 253 (observing that accord and satisfaction is analogous to mutual rescission); 29 *Willston on Contracts* § 73.20 (4th ed.) (mutual rescission "really amounts to an accord and satisfaction, but the courts typically discuss the matter in terms of mutual rescission rather than accord and satisfaction."). The doctrine of accord and satisfaction

> means (1) substituting an agreement (accord) for the obligation or cause of action, and (2) performing the substituted agreement (satisfaction). … As with any contract, an accord requires offer and acceptance.

*Bennett v. Kisluk*, 1991-NMSC-060, ¶ 8, 112 N.M. 221 (citation omitted). For example, if a debtor tenders a check as full settlement of a disputed claim and the creditor accepts the check and appropriates the check to his own use, then the creditor "has entered into an accord and satisfaction of a disputed or unliquidated claim." *Miller v. Montgomery*, 1967-NMSC-107, ¶¶ 4-5, 77 N.M. 766.

The New Mexico Supreme Court in *Warren v. New York Life Insurance Co.* addressed the issue of mutual rescission in the context of a claim for disability benefits under a life insurance policy. 1936-NMSC-031, 40 N.M. 253. In that case, the insurer notified the insured and beneficiary that is was rescinding the policy because, like in this case, the insurer failed to disclose facts on his insurance application relevant to his insurability. *Id.* at ¶ 7. The insurer then tendered a premium refund check to the insured, which the beneficiary cashed. *Id.* at ¶¶ 7-9. The New Mexico Supreme Court agreed with the insurer that mutual rescission occurred under those circumstances. *Id.* at ¶ 14.

As the Colorado Supreme Court explained in *Avemco Ins. Co. v. N. Colo. Air Charter, Inc.*,

> even if there exists a good-faith controversy between the parties regarding the insurer's right to rescind, the acts of the insurer tendering the check with the explicit representation that the check is offered to effectuate a rescission, and the cashing of that check by the insured with knowledge of the insurer's intent to rescind, renders the rescission effective notwithstanding the contested grounds for the rescission in the first instance….

38 P.3d 555, 559 (Colo. 2002) (citing, in part, *Warren*, 1936-NMSA-03, 40 N.M. 253). The Colorado Supreme Court went on to hold that, under those circumstances, a court infers rescission and the insured may rebut the inference of rescission with evidence that is "more than an assertion of a subjective intent not to rescind." *Id.* at 563.

Here, the undisputed evidence shows that Plaintiff informed Mrs. Silva in writing, either in April 2017 or May 2017, that Plaintiff believed rescission was appropriate. (Doc. 57-2) at 2; (Doc. 64) at 7. Plaintiff also informed Mrs. Silva that it, therefore, would be tendering to her a check to refund premiums, plus interest, and that cashing of the check would constitute an agreement that the life insurance policy was rescinded. (Doc. 57-2) at 2. Moreover, Plaintiff informed Mrs. Silva that acceptance of the refund check "is without reservation and in full and

12

complete satisfaction of any claims you may have under the" life insurance policy. *Id.* Mrs. Silva then received a refund check, dated April 28, 2017, which noted that it was a refund for premiums and that "[c]overage is hereby rescinded." (Doc. 57-5). It is undisputed that Mrs. Silva endorsed the check and cashed it. *Id.* These undisputed facts raise an inference of accord and satisfaction, or mutual rescission.

Mr. Saul makes various arguments to rebut an inference of accord and satisfaction, or mutual rescission. First, Mr. Saul suggests that the April 2017 letter "may have been 'forged'" because Mrs. Silva only received the May 2017 letter, and the April 2017 letter has higher Bates numbering than the May 2017 letter. (Doc. 64) at ¶ 14. Mr. Saul, however, does not contest that, in fact, Mrs. Silva, received the May 2017 letter from Plaintiff explaining the rescission and what would constitute accord and satisfaction. This first argument, thus, does not rebut the inference of an accord and satisfaction, or mutual rescission.

Second, Mr. Saul alleges that Plaintiff sent the refund check to Mrs. Silva after sending the "Rescission Letter." *Id.* at ¶ 15. Yet, Mr. Saul does not explain why it matters that Plaintiff sent the refund check to Mrs. Silva separately from a "Rescission Letter." Mr. Saul's second argument also does not rebut the inference of an accord and satisfaction, or mutual rescission.

Third, Mr. Saul asserts that the refund check was only for interest on the "unpaid death benefit" and that the check did not indicate that Mrs. Silva agreed to the rescission. *Id.* Mr. Saul, however, does not provide any credible evidence to support his claim that the refund check was only for interest on the unpaid death benefit nor does he cite any caselaw, or other law, that the refund check must explicitly state that Mrs. Silva agrees to the rescission by cashing the check. Even so, the language on the refund check clearly indicates that Plaintiff is tendering the check as a "[r]efund of premiums paid under contract A8118559" and that "[c]overage is hereby

rescinded." (Doc. 57-5). No reasonable jury, even viewing this language in the light most favorable to Defendants, could find that the refund check was not actually a refund of premiums or that the refund check did not notify Mrs. Silva that cashing the check would constitute a rescission of the life insurance policy. This third argument, likewise, does not rebut the inference of an accord and satisfaction, or mutual rescission.

Fourth, Mr. Saul contends that the "'refund check' is not agreeable" and that he has attempted to return the $1,928.69 to Plaintiff. Mr. Saul, though, does not provide any evidence that Plaintiff accepted Mr. Saul's $1,928.69 check. As with the other arguments, the fourth argument does not rebut the inference of an accord and satisfaction, or mutual rescission.

Finally, Mr. Saul notes that, according to the May 2017 letter, an insured can contest the rescission decision by bringing a legal action. Although Mr. Saul is correct in noting that the May 2017 letter states that an insured or beneficiary can contest the rescission by suing, Mrs. Silva, instead, chose to cash the refund check, which under the rescission letter constitutes full satisfaction of any claim she would have against Plaintiff. This last argument does not rebut the inference of an accord and satisfaction, or mutual rescission, as well.

Because a reasonable jury, viewing the evidence in the light most favorable to Defendants, could not find that Mr. Saul rebutted the inference of an accord and satisfaction, or mutual rescission, the Court determines, as a matter of law, that an accord and satisfaction, or mutual rescission, occurred when Mrs. Silva cashed the refund check. For this additional reason the life insurance policy is void and summary judgment should be entered in favor of Plaintiff.

3. *Champerty*

In light of the above determinations, the Court find it unnecessary to address Plaintiff's champerty argument. The Court, thus, concludes that for all of the foregoing reasons Plaintiff is

entitled to summary judgment on its declaratory judgment lawsuit. That being the case, Defendants' counterclaims are rendered moot.

*4. Mr. Saul's Request for Further Briefing*

Should the Court grant the Motion for Summary Judgment, Mr. Saul asks that the Court permit him "to amend, supplement, or otherwise clarify" his response to the Motion for Summary Judgment. Because the Federal Rules of Civil Procedure and the Local Rules do not provide for such additional briefing, the Court denies Mr. Saul's request.

IT IS ORDERED that

1. Plaintiff's Opposed Motion for Summary Judgment (Doc. 57) is granted;

2. a declaratory judgment will be entered in favor of Plaintiff;

3. Defendants' counterclaims are rendered moot; and

4. Mr. Saul's request for further briefing is denied.

_____
UNITED STATES DISTRICT JUDGE